UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| EVAN WILFORD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:21-cv-00016-JMS-MJD |
| | ) |
| JOHN PLASSE Sheriff, | ) |
| CHARLIE FUNK Captain, | ) |
| CASEY LEE Lt., | ) |
| | ) |
| Defendants. | ) |

**Order Granting Motion for Summary Judgment and Directing Further Proceedings**

Evan Wilford filed this civil rights suit alleging that he was subjected to unconstitutional conditions of confinement while he was incarcerated in the Vigo County Jail during the COVID-19 pandemic. The defendants have filed a motion for summary judgment. Dkt. 50. For the reasons explained below, the motion is **granted** as to the defendants in their individual capacities.

**I.
Standard of Review**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

## II.
## Factual Background

At screening, the Court permitted Mr. Wilford to proceed on Fourteenth Amendment claims against Sheriff John Plasse, Captain Charlie Funk, and Lt. Casey Lee based on his allegations that jail staff failed to implement any COVID-19 protections beyond quarantining newly admitted inmates. Dkt. 15 at 1−2.

### A. The Parties

Mr. Wilford was incarcerated in the jail from April 2020 to April 2021 due to a probation violation. Dkt. 34 at 15.

John Plasse has been the Vigo County Sheriff since January 1, 2019. Dkt. 30-2 at ¶¶ 1−2. Charles Funk is the Jail Commander. *Id.* at ¶ 3. Casey Lee is the Jail Matron. *Id.* at ¶ 4. Commander Funk and Lt. Lee are responsible for the day-to-day operation of the Jail. *Id.* at ¶ 5.

### B. Precautionary Measures for COVID-19 at the Jail

On March 11, 2020, the World Health Organization declared COVID-19 a pandemic.[1] Since then, the Vigo County Health Department has been in daily contact with the Vigo County jail making recommendations about COVID-19 precautions. Dkt. 59-1 at ¶¶ 5, 7. The Vigo County Health Department's recommendations are based on guidelines from the State Board of Health and the Centers for Disease Control ("CDC"). *Id.* at ¶ 8.

Inmates booking into the jail were quarantined for two weeks beginning in March 2020. Dkt. 30-3 at ¶ 7.

The jail issued masks to inmates attending court hearings in June 2020. Dkt. 30-2 at ¶ 7. Jail staff began wearing masks in August 2020. *Id.* at ¶ 8. Masks were given to inmates who were in quarantine, leaving general population, moving around the facility, and in common areas in November 2020. *Id.* at ¶ 10. Mr. Wilford testified that he received a face mask in August 2020 and began wearing one at all times except when he showered. Dkt. 34 at 38.

---

[1] *See* Centers for Disease Control and Prevention, "CDC Museum COVID-19 Timeline," https://www.cdc.gov/museum/timeline/covid19.html (last visited Jan. 13, 2022).

In December 2020, an inmate who died following a medical episode tested positive for COVID-19. Dkt. 59-1 at ¶ 19. The Indiana Department of Health ordered that all of the inmates in the jail be tested following his death, and over 100 inmates tested positive. *Id.* at ¶¶ 19−23. After this COVID-19 outbreak, all inmates were required to wear masks. *Id.* at ¶ 14. Before the outbreak, inmates were not required to wear masks "because of concerns related to compliance." *Id.* at ¶ 15.

After the outbreak, the Indiana Department of Health instructed the jail to be locked down. Dkt. 30-3 at ¶ 17. During the lockdown, inmates were allowed out of their cells for one hour each day to shower and speak with family by phone or through the kiosk. *Id.* at ¶ 18. The jail's medical department spoke to inmates in groups about what a positive COVID-19 test meant and what signs and symptoms to look for. *Id.* at ¶¶ 19−21. Jail officers were instructed to contact the medical department if any inmate complained of COVID-19 symptoms. *Id.* at 23.

Inmates are provided with cleaning supplies each day, which include a mop, a mop bucket with a cleaning solution with disinfectant, dust mop, toilet brush, spray bottle, and rags. Dkt. 30-4 at ¶¶ 17−20. Trustees began disinfecting hard surfaces and holding cells in March 2020. *Id.* at ¶ 21. More cleaning materials were provided after the December 2020 outbreak. *Id.* at ¶ 22.

COVID-19 tests were not available at the jail until December 2020, when they were provided by the Health Department. Dkt. 59-1 at ¶¶ 16−17. COVID-19 vaccines became available at the jail in March 2021 and have been available to inmates since that time. *Id.* at ¶¶ 26, 30.

### C. Mr. Wilford's Illness and Claims

In November 2020, Mr. Wilford lost his taste of smell and taste and had cold sweats, a stuffy nose, body aches, and a scratchy throat. Dkt. 34 at 20. In mid-November, he submitted a

request through the jail kiosk to be seen by a nurse and receive a COVID-19 test. *Id.* at 21. Someone responded back to him that the jail did not have any COVID-19 tests available and that Mr. Wilford was "probably just under the weather due to weather change." *Id.* at 21−23. He submitted another healthcare request on November 27, and a nurse responded she would see him during sick call. *Id.* at 23. The nurse checked his vitals and told him that she could not do anything about it because there was no cure for COVID-19. *Id.* at 23−24. He received no medication at that time. *Id.* at 24-25. Mr. Wilford experienced COVID-19 symptoms for about two and a half weeks. *Id.* at 25.

Mr. Wilford tested positive for COVID-19 during the December 2020 COVID-19 outbreak. Dkt. 30-2 at ¶ 12. After he tested positive, he filed a grievance in the jail's kiosk stating that the "sheriff and jail commander's neglect of handling COVID-19 virus and their criminal dismissal of government mandate preventative measures by maintaining an overcrowded facility" caused him to contract COVID-19. Dkt. 34 at 30. Mr. Wilford testified that he was housed in a four-man cell, and there were always six or seven men assigned to his cell. *Id.* at 31. He also testified that he believed the defendants should have ensured inmates had masks as of March 2020 and should have enforced mask rules for staff and inmates. *Id.* at 38−41.

Mr. Wilford testified that he sued Sheriff Plasse, Commander Funk, and Lt. Lee because "they're the ones in charge" and should have issued more COVID-19-related rules in light of the state of emergency. *Id.* at 38, 47. Mr. Wilford has never met Lt. Lee. *Id.* at 46.

In April 2021, Mr. Wilford was diagnosed with diabetes, which he attributes to contracting COVID-19 due to a lack of family history. *Id.* at 35-38.

## III.
## Discussion

### A. Fourteenth Amendment Standard

Because Mr. Wilford was at all relevant times a detainee being held on a probation violation, the parties analyzed his conditions-of-confinement claim under the Fourteenth Amendment's Due Process Clause. *Hardeman v. Curran*, 933 F.3d 816, 821−22 (7th Cir. 2019).[2] To prove a conditions-of-confinement claim, the Court applies an objective standard. *Id.* at 823. That is, Mr. Wilford must show "that the conditions in [the jail] posed an objectively serious threat to his health; that the officers' response was objectively unreasonable under the circumstances; and that they acted purposely, knowingly, or recklessly with respect to the consequences of their actions." *Mays v. Emanuele*, 853 F. App'x 25, 27 (7th Cir. 2021) (citing *Hardeman*, 933 F.3d at 823, 827 and *Miranda*, 900 F.3d at 353−54). The officers' response is objectively unreasonable if it is "not rationally related to a legitimate nonpunitive governmental purpose" or is "excessive in relation to that purpose." *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015) (cleaned up). "The objective-reasonableness standard requires that we focus on the totality of the circumstances in the case and gauge objectively—without regard to any subjective belief held by the individual—

---

[2] The Court understood Mr. Wilford to be a pretrial detainee, and it was not until the summary judgment materials were filed that it became clear he was in the jail pursuant to a pending probation violation. In *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018), the Seventh Circuit clarified that pretrial detainees' medical care claims are analyzed under the objective unreasonableness inquiry identified in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015). Since *Miranda*, the Seventh Circuit has not decided whether an individual held on a pending probation violation "fits within the Eighth Amendment or the Fourteenth Amendment framework." *Stockton v. Milwaukee Co.*, 44 F.4th 605, 614 n.3 (7th Cir. 2022). Because the parties present the claim under the Fourteenth Amendment framework, the Court does the same.

whether the response was reasonable." *McGee v. Parsano*, 55 F.4th 563, 569 (7th Cir. 2022) (cleaned up).

### B. Application of the Standard to the Conditions in the Vigo County Jail

A jury could find that the COVID-19 virus created a serious risk of harm to detainees' health, and that the general risk of exposure is exacerbated by the close quarters that detainees are subjected to. *See Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (finding that "the objective prong is easily satisfied" as to inmates' claims under Eighth Amendment challenging conditions of confinement in federal prison with dormitory housing at the start of the pandemic).

Thus, the Court must decide if the defendants responded reasonably to the risk, or whether they acted recklessly. The defendants framed the relevant inquiry as "whether Plasse, Funk and Lee were personally involved in creating conditions that caused Wilford to test positive for and contract COVID-19." Dkt. 51 at 6. Such framing is appropriate because "[i]ndividual liability under § 1983 … requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted). "[S]upervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018); *see also Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002) ("Under § 1983, there is no respondeat superior liability.").

First, there is no evidence that Sheriff Plasse was involved in day-to-day jail operations. That task, he attested, was left to Commander Funk and Lt. Lee. Mr. Wilford argues that Indiana Code § 36-2-13-5(a)(7) proves that Sheriff Plasse was personally responsible because it states that

7

"the sheriff shall take care of the county jail and the prisoners there." Dkt. 57 at 4. Plaintiffs have relied on this statute when bringing state law negligence claims against a sheriff. *See, e.g., Trout v. Buie*, 653 N.E.2d 1002, 1008 (Ind Ct. App. 1995); *Perkins v. Lawson*, 312 F.3d 872, 876 (7th Cir. 2002) (citing *Trout*). And the Seventh Circuit has observed that this statute makes it plain that the sheriff is an appropriate defendant when bringing a claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) because he "serves as the county's official decision-maker in matters involving the county jail." *Luck v. Rovenstine*, 168 F.3d 323, 326 (7th Cir. 1999). But this statute does not demonstrate that Sheriff Plasse was personally involved in the actions at issue in this case, and there are no facts that suggest his personal involvement. Thus, Sheriff Plasse is entitled to summary judgment as to a Fourteenth Amendment claim against him in his individual capacity.

Commander Funk and Lt. Lee were responsible for day-to-day jail operations. There is no direct evidence in the record that they personally interacted with Mr. Wilford with respect to his placement in an overcrowded cell, distributing masks, procuring COVID-19 tests, or coordinating his medical care when he became symptomatic in November. Still, Mr. Wilford's submission of a grievance complaining about jail administrators' failure to adhere to COVID-19 protocols and the nature of Commander Funk and Lt. Lee's roles in the jail provide some evidence that they were responsible for maintaining constitutional conditions of confinement in the jail. *See, e.g., Gray v. Hardy*, 826 F.3d 1000, 1008 (7th Cir. 2016) (holding that the warden could be personally liable for cell conditions because he "not only knew about the problems but was personally responsible for changing prison policies so that they would be addressed"). Thus, the Court declines to

determine the merits of Mr. Wilford's underlying claim and proceeds to the defendants' qualified immunity defense.

### C. Qualified Immunity

To the extent that the defendants had personal involvement in the conditions that resulted in Mr. Wilford contracting COVID-19, the Court concludes they are entitled to qualified immunity. "Qualified immunity is a doctrine that protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019) (cleaned up). Once a defendant raises qualified immunity as a defense, the burden shifts to the plaintiff to defeat it by showing "two elements: first, that the facts show a violation of a constitutional right, and second, that the constitutional right was clearly established at the time of the alleged violation." *Id.* (cleaned up). "'If *either* inquiry is answered in the negative, the defendant official' is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (quoting *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (emphasis in original)).

The Court finds the second element dispositive. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. . . . Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 11−12 (2015) (cleaned up). Courts cannot define "clearly established law at a high level of generality" but rather must assess "whether the violative nature of *particular* conduct is clearly established." *Id.* (cleaned up). The

9

doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments[.]" *Carroll v. Carman*, 574 U.S. 13, 17 (2014).

It is clearly established that prison officials may not "be deliberately indifferent to the exposure of inmates to a serious, communicable disease" under the Eighth Amendment, *Helling v. McKinney*, 509 U.S. 25, 33 (1993), and that the right to safe conditions extends to pretrial detainees under the Fourteenth Amendment, *Hardeman*, 933 F.3d at 821−22. And although COVID-19 was a new virus, the duty to protect inmates from needless exposure to a serious illness "need not be litigated and then established disease by disease [.]" *Estate of Clark v. Walker*, 865 F.3d 544, 553 (7th Cir. 2017).

But the issue is whether Captain Funk and Lt. Lee were on notice that their particular conduct—placing detainees in overcrowded cells, failing to implement a universal mask rule before the December 2020 COVID-19 outbreak, and failing to procure COVID-19 tests—violated Mr. Wilford's Fourteenth Amendment rights. Mr. Wilford has cited no case that suggests as much,[3] and the Court can find none. Instead, many courts have granted qualified immunity to jail and prison administrators given the evolving nature of the virus and the related recommendations for keeping incarcerated individuals safe. *See, e.g., Jones v. Burt*, Case No. 1:21-cv-41, 2022 WL 4244298, *5 (W.D. Mich. July 15, 2022) (granting qualified immunity on claim related to failure

---

[3] Mr. Wilford cites Ind. Code § 36-2-13-5(a)(7) and *Weatherholt v. Spencer County*, 639 N.E.2d 354, 356 (Ind. Ct. App. 1994) for the proposition that the sheriff has a duty to administer the jail in a manner that ensures the safety of the inmates, and *Rhodes v. Chapman*, 542 U.S. 337, 347 (1981), for the proposition that inmates' safety includes humane conditions which provide for their basic human needs. Dkt. 57 at 7. While defining the legal standard at a "high level of generality," these cases are not factually similar to the conduct Mr. Wilford complains about here.

10

to social distance because "[n]o court has found that the inability of prison officials to ensure social distancing occurs during the COVID-19 pandemic, standing by itself, and in light of other measures . . . such as . . . setting up isolation areas for known COVID-positive prisoners, violates the Eighth Amendment."); *Ross v. Russell*, Case No. 7:20-cv-000774, 2022 WL 767093, *14 (W.D. Va., Mar. 14, 2022) (finding jail officials were entitled to qualified immunity because, given the ongoing and changing guidance from health officials as to a novel virus, "neither the policies or occasional lapses [in enforcing the policies] were clearly insufficient to protect prisoners").

Qualified immunity is especially appropriate because Commander Funk and Lt. Lee are correctional professionals, not health professionals. The undisputed evidence is that the COVID-19 protective measures they implemented were at the recommendation of the Vigo County Health Department. Dkts. 30-2; 30-3; and 58-1. Because courts have "long recognized that correctional institutions typically engage in the division of labor between medical professionals and other security and administrative staff," it was reasonable for Commander Funk and Lt. Lee to defer to the health department for guidance on handling COVID-19 within the jail. *McGee*, 55 F.4th at 569, 573 (cleaned up) (upholding grant of qualified immunity for jail officials in medical care context because Seventh Circuit precedent "dictates that corrections officers are not constitutionally obligated to override the judgment of medical professionals unless they have reason to know that an inmate is receiving inadequate treatment"); *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019) (holding that plaintiff could not prove the subjective element of deliberate indifference claim "because the defendants are all non-medical officials who reasonably relied on the judgment of medical professionals").

Accordingly, Commander Funk and Lt. Lee are entitled to qualified immunity, and summary judgment is **granted** as to all claims against them in their individual capacity.

## IV.
## Conclusion and Further Proceedings

The defendants' motion for summary judgment, dkt. [50], is **granted**. Sheriff Plasse is entitled to summary judgment because there was no evidence in the record that he was personally involved in the conditions of confinement at the Vigo County Jail about which Mr. Wilford complained. Commander Funk and Lt. Lee are entitled to qualified immunity. All claims against the defendants in their individual capacities are **dismissed**.

In the course of ruling on the instant motion, the Court has reviewed and reconsidered Mr. Wilford's amended complaint, dkt. [14], and this Court's order screening his amended complaint, dkt. [15]. The Court's screening order did not specify whether Mr. Wilford's Fourteenth Amendment claims would proceed against the defendants in their individual or official capacities. Construing Mr. Wilford's amended complaint liberally, he has stated a policy-or-practice claim pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *See Clark v. Henninger*, 221 F.3d 1338, 2000 WL 968044, *5 (7th Cir. 2000) (unpublished) (noting that, when construing a pro se complaint that does not specify the capacity in which a defendant is sued, an official capacity claim "will be presumed when then 'the indicia of an official policy or custom are present in the complaint'") (quoting *Hill v. Shelander*, 924 F.2d 1370, 1373 (7th Cir. 1991)). The Court also reconsiders its screening order to the extent that Mr. Wilford also pleaded a state law negligence claim in his amended complaint.

The magistrate judge is requested to set this matter for a status conference to discuss further proceedings with respect to Mr. Wilford's *Monell* claim and state law negligence claims, including whether discovery needs to be reopened and deadlines for a briefing schedule should the parties wish to file dispositive motions with respect to these claims. The magistrate judge is also requested discuss the possibility of an agreed resolution with the parties.

**IT IS SO ORDERED.**

Date: 2/3/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

David P. Friedrich
WILKINSON GOELLER MODESITT WILKINSON AND DRUMMY
dpfriedrich@wilkinsonlaw.com

William Russell Morris, Jr.
LAW OFFICE OF WILLIAM R. MORRIS, JR.
wimorris.attorney@gmail.com

Magistrate Judge Dinsmore